## STATE OF CONNECTICUT *v.* MARK DOWNEY
### (AC 16446)

Foti, Landau and Spear, Js.

Argued February 27—officially released May 13, 1997

*Richard Emanuel*, assistant public defender, for the appellant (defendant).

*Judith Rossi*, assistant state's attorney, with whom were *Joan E. Alexander*, assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, for the appellee (state).

*Opinion*

SPEAR, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a.[2] He claims that (1) there was insufficient evidence of the element of an intent to kill to sustain the guilty verdict, (2) the trial court improperly denied his motion to suppress statements, and (3) the trial court improperly admitted evidence that the defendant had acted in a threatening manner toward the victim in the weeks preceding the murder. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. On March 29, 1992, at approximately 10:22 p.m., the defendant dialed 911 to report a shooting and to request medical assistance. He stated that he had "disarmed" a rifle accidentally and shot his girlfriend. He gave the dispatcher directions to the apartment that he shared with the victim. The dispatcher instructed him to wait outside with his hands in the air.

When the police officers arrived, the defendant was waiting for them outside with his hands raised. The police officers approached the defendant and patted him down for weapons. An officer read the *Miranda*[3] rights to him and he was then handcuffed and placed in the backseat of a patrol car. The officers noticed an odor of alcohol on the defendant, but he was not

---

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

[2] General Statutes § 53a-54a (a) provides in pertinent part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . . "

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

incoherent or stumbling and appeared to understand and follow their instructions.

The police officers then entered the victim's apartment and found a Weatherby 30.06 rifle on the floor approximately eight to ten feet from the door. One of the officers, Corporal John Driscoll, picked up the rifle, removed a spent shell from the chamber, and placed it against a wall. He also observed a box of cartridges, from which one cartridge was missing.

Earlier that evening, Mary Anthony and her boyfriend, Philip Weidelman, had visited the defendant and the victim. The defendant showed the Weatherby rifle to Weidelman and told him that the safety mechanism was on. Weidelman saw a box of cartridges in the gun case, and noticed that none of the cartridges was missing.

The victim was found lying face down near the bedroom door. She was unconscious and had no detectable pulse or respiration. She had a bluish complexion and a gunshot wound in her upper right shoulder. The blood near the wound was in the early stages of clotting. Attempts to resuscitate the victim were futile. A Life Star helicopter took the victim to Hartford Hospital, where she was pronounced dead.

While the other officers were attempting resuscitation, Driscoll periodically checked on the defendant, whom he knew from previous encounters. The defendant, who was nervous and talkative, made several unsolicited statements. He said that he had accidentally shot the victim while he was holding the rifle. He also said that while holding the rifle, he began to slide the bolt down. He then changed his mind, and as he put the handle of the bolt down, the rifle discharged.

After the victim was removed, the defendant agreed to go to the police station for an interview, stating that he wanted to cooperate "110 percent." At the station,

an officer advised the defendant of his rights and the defendant signed a waiver form. The officers then conducted a tape-recorded interview.[4]

During the interview, the defendant made the following statements. After his guests left, the defendant sat on the living room floor near the television and the victim sat in a nearby chair, reading a book. After a while, he decided to clean his Weatherby rifle, which he normally kept unloaded. As he pulled the rifle out of its case, the gun slipped and, as he reached for it, it discharged. The defendant claimed that the trigger action on the rifle was sensitive. The victim had risen from her chair, and he saw her fall to the ground. The defendant was evasive when asked about his exact position and that of the victim when the gun was fired. During the course of the interview, the defendant was angry and stated that he was "pissed" about what had happened. He was not sad, remorseful or confused at any point. After the interview, one of the officers typed a statement of the defendant's recitation of events. The defendant read the statement, initialed two corrections, and signed it.

Later that same evening, police officers drove the defendant to the house of his friend Bill Cleary. Over the next few days, the defendant told Cleary different versions of what had occurred. He stated first that he picked up the rifle and was startled by a loud noise, the gun slipped, and, as he grabbed for it, the safety was dislodged and the rifle discharged. In the second version, he stated that he dropped the rifle and, as it fell, the butt hit the floor, causing it to discharge. Cleary did not believe the defendant's story and demanded that he tell him the truth. The defendant replied that after Anthony and Weidelman left, he and the victim

---

[4] The tape recording was played for the jury.

had a "slight spat," he shot her and she got what she deserved.

In the weeks preceding the shooting, the defendant, on two occasions, made disparaging remarks and threatening motions to the victim. On both occasions the defendant was intoxicated. Approximately one to two months before the shooting, he was seen making a motion with his hand as if it were a gun and pointing at the victim's shoulder. While making the motion, he said, "If you know what's good for you, you'll do as I've told you to do or else you know what I'll—but you know what's at home waiting." Approximately three to four weeks prior to the shooting, the defendant again made disparaging remarks to and about the victim and again made a gun-like motion with his hand pointed at the victim.

## I

The defendant first claims that there was insufficient evidence of intent to kill to sustain the guilty verdict. We disagree.

When reviewing an insufficiency claim, our courts apply a two-prong test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . Our inquiry into whether the evidence in the record would support a finding of guilt beyond a reasonable doubt does not require us to ask if we believe that the evidence established guilt beyond a reasonable doubt, but rather if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . Once a defendant has been found guilty of the crime charged, we conduct our judicial review of all of the

evidence in the light most favorable to the prosecution." (Citations omitted; internal quotation marks omitted.) *State* v. *Marsala*, 44 Conn. App. 84, 93–94, 688 A.2d 336 (1997).[5]

## A

The defendant first asserts that the jury's conclusion that the defendant intended to kill the victim was based on speculation and conjecture. We disagree.

Intent to kill is an essential element of murder. See General Statutes § 53a-54a. The state must prove beyond a reasonable doubt that the defendant "had the conscious objective to cause the death of the victim." *State* v. *Montanez*, 219 Conn. 16, 20, 592 A.2d 149 (1991). "[T]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct . . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Citations omitted; internal quotation marks omitted.) *State* v. *Torwich*, 38 Conn. App. 306, 314, 661 A.2d 113, cert. denied, 235 Conn. 905, 665 A.2d 906 (1995). "An intent to cause death may be inferred from circumstantial evidence

[5] The defendant urges this court to adopt the proposed standard of review set forth in J. Newman, "Beyond Reasonable Doubt," 68 N.Y.U.L. Rev. 979, 987–92 (1993). Judge Newman proposes that an appellate court deciding an insufficiency claim should ask "only whether a reasonable jury could find guilt beyond a reasonable doubt." We decline to do so because the "any rational trier" test has been established by our Supreme Court and we cannot reexamine, change or discard such precedents. See *State v. Panella*, 43 Conn. App. 76, 82–83, 682 A.2d 532, cert. denied, 239 Conn. 937, 684 A.2d 710 (1996).

such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." *State v. Zdanis*, 182 Conn. 388, 396, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed 2d 207 (1981).

The following evidence, which the jury reasonably could have credited, refutes the defendant's claim. The state introduced evidence that the cause of death was a gunshot wound to the neck and chest. The bullet entered the upper right shoulder in a downward trajectory, fractured her right clavicle and first two ribs, injured her right lung, transected her esophagus and trachea, lacerated her aorta and heart, and finally lodged in her spleen. The extensive injury under the skin surrounding the entry wound indicated that a high powered weapon was used. In addition, punctate marks caused by gunpowder stippling were found near her right ear. Metal fragments and gunpowder were found on her clothing. Blood spatter was also found inside the barrel of the rifle, indicating that the victim was shot from a distance of one to two feet. Atomic absorption tests that were performed on the defendant's hands indicated that the rifle was held in a normal shooting position.

The defendant argues that the evidence was insufficient because the record is devoid of evidence that the defendant harbored animosity toward the victim to the degree that he would intentionally cause her death and because he summoned medical assistance. We conclude, however, that under the circumstances, the evidence supported the jury's conclusion that the defendant possessed the intent to kill the victim. The evidence shows that the defendant shot the victim at close range with a high powered rifle. Although he claimed to have shot her while he was seated on the floor and she was standing, the evidence revealed that

the cause of death was a gunshot that traveled in a downward trajectory to the shoulder. Earlier on the evening of the shooting, the defendant stated that the rifle was unloaded and that the box of cartridges was full. When the police officers arrived at the scene, however, one of the cartridges was missing from the box, supporting the inference that the defendant loaded the rifle shortly before the shooting. Moreover, the defendant told Cleary that he and the victim had argued that evening. The evidence also revealed that shortly before the incident in question, the defendant had acted in a hostile and threatening manner toward the victim. Furthermore, the jury reasonably could have inferred consciousness of guilt from the defendant's conflicting statements. See *State* v. *Grant*, 219 Conn. 596, 604, 594 A.2d 459 (1991).

## B

The defendant also contends that, in light of his intoxication, a reasonable jury could not have found beyond a reasonable doubt that he intended to kill the victim. The basis for the defendant's claim is expert testimony that his blood alcohol level would have been 0.28 percent at the time of the shooting, assuming that (1) he had not consumed any alcohol between the time of the shooting and the time his blood was drawn, (2) his blood alcohol level was decreasing at the time of the shooting, and (3) the defendant had ceased drinking prior to the shooting. We are unpersuaded.

While intoxication is not a defense, "[a] criminal defendant's intoxication is relevant to the determination of his capacity to form a specific intent to commit a crime. . . . Intoxication, however, does not automatically negate intent. . . . It is for the jury to decide, after weighing all the evidence adduced at trial, whether a criminal defendant's intoxication rendered him incapable of forming the intent required to commit the crime

with which he is charged." (Citations omitted; internal quotation marks omitted.) *State* v. *Traficonda*, 223 Conn. 273, 279, 612 A.2d 45 (1992).

Evidence at trial established that the defendant was a heavy drinker and that he often showed up for his job as an automobile mechanic while intoxicated. Yet, he was still capable of performing his duties. Police officers' testimony also established that, while it was evident that the defendant had been drinking, he was coherent, had no difficulty describing the events that transpired that evening and appeared to understand and follow the dispatcher's and police officers' directions. His speech was not slurred, he did not have difficulty walking, and he remained alert throughout the interview at the police station. In light of this evidence, the jury reasonably concluded that his intoxication did not prevent him from forming the requisite intent to kill.

## II

The defendant next claims that the trial court improperly denied his motion to suppress the statements he made to the police on the night of the shooting. We disagree.

## A

The defendant first asserts that the statements should have been suppressed because they were the fruits of an unlawful seizure in violation of the federal and state constitutions. This claim was first alleged in his pretrial motion to suppress. At the time of the hearing on the motion, however, he did not pursue this claim. Instead, he argued only that the statements were involuntary and that the defendant had not validly waived his rights as required by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S.

Ct. 1602, 16 L. Ed. 2d 694 (1966). The trial court never considered his *Dunaway* claim.[6]

The state argues, and we agree, that this claim was unpreserved. Nevertheless, the defendant seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 240, 567 A.2d 823 (1989). In *State* v. *Ostroski*, 184 Conn. 455, 459, 440 A.2d 166 (1981), our Supreme Court recognized that our courts may consider an unpreserved *Dunaway* claim. See also *State* v. *Marino*, 190 Conn. 639, 655, 462 A.2d 1021 (1983).

In order to obtain review, the defendant must first show that "the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

The burden is on the defendant to provide an adequate record for review. Id. In this case, however, the defendant has failed to do so. The only evidence before the trial court was presented in the context of the defendant's claims of involuntariness and waiver. The issue of whether an *unlawful*[7] seizure occurred was

---

[6] The defendant's claim is based on the holding in *Dunaway* v. *New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). In *Dunaway*, the United States Supreme Court held that a confession following an arrest made without probable cause, followed by the transportation of the defendant to the police station for interrogation, was inadmissible.

[7] Although we conclude in part II that the defendant was in custody for *Miranda* purposes, the record is inadequate as to whether custody was lawful, i.e., whether the defendant was seized for fourth amendment purposes and whether there was probable cause to seize him. See *State* v. *Ostroski*, 186 Conn. 287, 290, 440 A.2d 984 (1982), cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982).

never presented to the trial court and consequently, the trial court never made the necessary factual determinations regarding seizure. See *State* v. *Medina*, 228 Conn 281, 301, 636 A.2d 351 (1994). Because the record is inadequate, we decline to review his claim.

B

The defendant also asserts that the statements should have been suppressed because the defendant did not make a valid waiver of his *Miranda* rights. We are unpersuaded.

"[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *State* v. *Januszewski*, 182 Conn. 142, 159, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). The warnings arc required only when the defendant is (1) in custody, and (2) subject to police interrogation. *State* v. *Brown*, 199 Conn. 47, 51, 505 A.2d 1225 (1986). "Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Id.

"The defendant bears the burden of proving custodial interrogation. . . . The trial court's determination of the historical circumstances surrounding the defendant's interrogation are questions of fact . . . which will not be overturned unless they are clearly erroneous. . . . In order to determine the ultimate issue of custody . . . we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of [the] circumstances, the trial court's finding is supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Lapointe*, 237 Conn. 694, 725, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996). "A person is in custody only if, in view of all the surrounding

circumstances, a reasonable person would have believed he was not free to leave. . . . The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (Citations omitted; internal quotation marks omitted.) *State* v. *Northrop*, 213 Conn. 405, 413–14, 568 A.2d 439 (1990).

At the suppression hearing, the trial court found that the defendant was not in police custody at the time the statements were given. Our review of the record, however, leads us to the conclusion that trial court's determination was clearly erroneous. Although a police officer testified that he asked the defendant to come voluntarily to the police station, the totality of the circumstances reveals that the defendant was in custody at the time he made the statements. As soon as the police arrived at the scene, an officer handcuffed him and placed him in the back of a police cruiser. Although the handcuffs were removed an hour later, he remained in the company of at least one officer for the remainder of the evening and was even escorted to the men's room. See *State* v. *Hoeplinger*, 206 Conn. 278, 288, 537 A.2d 1010 (1988). He was at the station for approximately eight hours, during which time he was never informed that he was free to leave. See *State* v. *Ostroski*, 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); cf. *State* v. *Derrico*, 181 Conn. 151, 154–55, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). Furthermore, he had no independent means of transportation to return home. *State* v. *Hoeplinger*, supra, 288. We conclude that for purposes of *Miranda* the defendant was in custody when the statement was made.

Our inquiry does not end here, however. We must next determine whether the trial court properly determined that the defendant validly waived his *Miranda*

rights. The defendant claims that any waiver was invalid because the tape recording does not indicate that the defendant read or heard the waiver of rights paragraph on the waiver form, and because he was nervous, upset and intoxicated.

"To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights . . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case." (Citations omitted.) *State* v. *Northrop*, supra, 213 Conn. 417. Relevant circumstances may include "the defendant's experience with the police and familiarity with the *Miranda* warnings; his level of intelligence, age, level of education, vocabulary and ability to read and write in the language in which the warnings were given; his emotional state; and the existence of any mental disease. . . . Evidence that the defendant appeared distraught does not alone prevent a knowing waiver of *Miranda* rights." (Citations omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 79, 621 A.2d 728 (1993).

We conclude that there was substantial evidence before the trial court to sustain its determination that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. The defendant knew one of the police officers from previous encounters and had at least three prior arrests and convictions for driving while under the influence of alcohol. He was a thirty-five year old high school graduate with a technical education. The tape-recorded statement revealed that the defendant's speech was clear, lucid, articulate and intelligent. Furthermore, the defendant signed the waiver form, which is " 'strong proof' that the waiver is valid." *State* v. *Northrop*, 213 Conn. 418.

B

The defendant also claims that his statements should have been suppressed because they were involuntary.[8] We disagree.

The state must prove, by a preponderance of the evidence, that a statement was voluntarily made. *State v. Barrett*, 205 Conn 437, 451–52, 534 A.2d 219 (1987). "Unless that burden is met, a [statement] compelled by pressure from a police officer is inadmissible for any purpose. . . . The United States Supreme Court recently declared that coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment.' *Colorado* v. *Connelly*, [479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)]. Provided that predicate exists, [t]he ultimate test remains . . . Is the [statement] the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to [make a statement], it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Barrett*, supra, 452.

The state cannot use an involuntary confession at trial without violating the defendant's right to due process of law. Id. Whether a statement is voluntary is a question of fact for the trial court to determine in the exercise of its discretion. *State* v. *Derrico*, 181 Conn. 151, 162–63, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). The trial court found in this

---

[8] In his brief, the defendant claims a violation of both federal and state constitutions. He fails, however, to analyze his claim under the state constitution and relies only on case law interpreting the federal constitution. Accordingly, we will review his claim only under a federal constitutional analysis. *State* v. *Northrop*, supra, 213 Conn. 420.

case that the state proved that the statements were voluntarily made.

We find no persuasive evidence of involuntariness on the record before us. The record is devoid of evidence that the police used threats or overt psychological pressure to overcome his will. In addition, the evidence shows that the police were respectful of the defendant's rights. See *State* v. *Medina*, supra, 228 Conn. 294. He claims, however, that the element of coercion exists because he was interrogated while intoxicated and "confused." The police officers who interrogated the defendant testified at trial that, although the defendant had been drinking the evening of the shooting, he spoke clearly and without confusion. A defendant's emotional state alone does not render a statement involuntary. See *State* v. *Byrd*, 34 Conn. App. 368, 641 A.2d 818 (1994), aff'd in part, 233 Conn. 517, 659 A.2d 1201 (1995), aff'd, 239 Conn. 405, 685 A.2d 669 (1996). Moreover, the defendant did not confess to murdering the victim; his explanation of events was entirely exculpatory. Furthermore, the record does not show that the defendant suffered from a disabling educational, intellectual or psychological deficit so severe as to overcome his will. See *State* v. *Northrop*, supra, 213 Conn. 420.

### III

The defendant finally claims that the trial court improperly admitted evidence that the defendant had acted in a threatening manner toward the victim in the weeks before the shooting. We disagree.

" '[E]vidence of prior acts of misconduct is inadmissible merely to show a defendant's bad character or tendency to commit criminal acts.' " *State* v. *Thomas*, 205 Conn. 279, 286, 533 A.2d 553 (1987). "[S]uch evidence 'may be allowed for the purpose of proving . . . *intent* [or] *motive* . . . .' " (Emphasis in original.) Id. "The

trial judge, however, must determine in the exercise of judicial discretion that its probative value outweighs its prejudicial tendency." *State* v. *Wild*, 43 Conn. App. 458, 463, 684 A.2d 720 (1996). A trial court's decision will be reversed only where there is a manifest abuse of discretion or if it appears that injustice will result. Id.

The defendant objected to the evidence that the defendant had made disparaging remarks to the victim and had pointed at her with a gun-like motion. The trial court overruled the defendant's objection and gave limiting instructions to the jury immediately after the evidence was introduced and again in its final charge that the evidence was to be considered only to prove motive and intent. On appeal, the defendant claims that the trial court abused its discretion because the evidence was not relevant and was exceedingly prejudicial.

The defendant admitted shooting the victim, but claimed that the incident was an accident. He also claimed that his relationship with the victim was a good one with no problems. The evidence that the defendant's relationship with the victim had deteriorated and that he acted in a threatening manner are relevant to his motive and intent.[9] See *State* v. *Thomas*, supra, 205 Conn. 286. Furthermore, any potential prejudice was cured by the limiting instructions. See *State* v. *Wild*, 43 Conn. App. 458, 464, 684 A.2d 720, cert. denied, 239 Conn. 954, 688 A.2d 326 (1996). We conclude that the trial court did not abuse its discretion in admitting the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] Intent to kill is an essential element of the crime charged, and while motive is not an element, it does strengthen the state's case. *State* v. *Harris*, 182 Conn. 220, 224, 438 A.2d 38 (1990).