## STATE OF CONNECTICUT *v.* TRAVIS L. WRIGHT (AC 21830)

Lavery, C. J., and Flynn and McDonald, Js.

Argued October 22, 2002—officially released April 8, 2003

*Joseph A. Moniz*, special public defender, for the appellant (defendant).

*Eileen F. McCarthy*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *James Bernardi*, supervisory assistant state's attorney, for the appellee (state).

MCDONALD, J. The defendant, Travis L. Wright, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a). On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress his confession, (2) excluded portions of his psychological records and (3) gave two "Chip Smith" charges to the jury, depriving him of his constitutional rights to due process and an uncoerced jury verdict. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 11, 1999, the lifeless body of Wieston Tarnowski, a victim of multiple stab wounds, was found in an abandoned vehicle in Stamford. While being interviewed at the Stamford police station following his arrest on June 25, 1999, on a charge of attempt to commit robbery, the defendant was asked about the Tarnowski homicide, and he indicated that he knew about the stabbing of a man in the south end of Stamford. The defendant subsequently confessed to twice stabbing a man in the chest after that man attacked him. The defendant told the police that he left that man in a vehicle in the area of Rockland Place and Atlantic Street in Stamford.

After a jury trial, the defendant was found not guilty of murder in violation of General Statutes § 53-54a and guilty of manslaughter in the first degree, as a lesser offense included within murder, in violation of § 53a-55 (a) and sentenced to seventeen years incarceration. This appeal followed.

I

The defendant first claims that the court improperly denied his pretrial motion to suppress the confession

that he gave to the police. On appeal, the defendant claims that the court improperly failed to base its decision on the totality of the circumstances surrounding that confession.[1] We disagree.

After a hearing on the motion to suppress, the court found the following facts in its memorandum of decision. "On June 25, 1999, Officer Michael Merenda of the Stamford police department went to the area of Spruce Street in Stamford, at approximately 6-6:15 a.m., on the report of a robbery. He had a description of several suspects who may have been involved in the robbery. Merenda saw three black males near the area of Fairfield Court matching this description who, upon seeing him, fled. One of the three was the defendant, who then came to a stop. Merenda detained the defendant pending further investigation.

"In the meantime, Officer David Dogali was involved in assisting the victim of this robbery, one [Alejandro] Pagan. Upon learning that Merenda had detained a suspect, Dogali drove Pagan to the detention scene. Pagan identified the defendant as one of his assailants.

"Merenda then arrested and handcuffed the defendant, placed him in his patrol car and advised him of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), from a card carried for those purposes. The defendant said he understood those rights. Merenda asked the defendant about his involvement in the robbery; the defendant said that he had been there, but the two others had actually committed the robbery of Pagan. The defendant also denied striking Pagan. The defendant then

[1] Although the defendant claims that both his federal and state constitutional rights were violated, he has failed to brief his state constitutional claims separately. Claims not briefed are deemed abandoned. Accordingly, we do not address any state constitutional claims. See *State* v. *William C.*, 71 Conn. App. 47, 54 n.5, 801 A.2d 823, cert. granted on other grounds, 262 Conn. 907, 810 A.2d 277 (2002).

said, 'I don't want to talk to you anymore,' so Merenda terminated the questioning and transported the defendant to the Stamford police department for booking. The defendant was then, again, administered his *Miranda* rights by way of a written notice of rights form. The defendant read the form, said he understood it and signed it at approximately 6:40 a.m.

"The defendant was put in a cell and remained there until later that morning. In the meantime, Officer Gregory Holt and Sergeant Anthony Luppinacci had come on duty. They, and later Officer John Lynch, would come to be involved in the questioning of the defendant. Holt and Luppinacci received a 'thumbnail sketch' of the Pagan robbery. They removed the defendant from his cell at approximately 11:49 a.m. They brought him into an interview room in the detective bureau. The officers did not give the defendant his *Miranda* rights again, then, because they saw that the earlier notice of rights form had been completed.

"The officers told the defendant that they wanted to talk to him about the Pagan robbery. The defendant appeared agreeable to this and spoke freely. The defendant admitted his involvement in the robbery, including punching Pagan and 'running' his pockets. The defendant also admitted having done similar robberies previously. The defendant agreed to give a written statement concerning the Pagan robbery. The officers reviewed yet another notice of rights form with the defendant and had him read and sign it. This was done at about 1:05 p.m. The officers took and typed the defendant's statement, concluding at about 2:21 p.m.

"At about this time, Officer Holt left the interview room and Luppinacci remained with the defendant. Luppinacci asked the defendant if he had any knowledge of any other criminal activity, or about the south end homicide involving Tarnowski [which Luppinacci put

to many people who were arrested]. The defendant asked what Luppinacci would do for him. Luppinacci said that he would speak to the prosecutor handling the case. The defendant then gave his first oral statement about the Tarnowski homicide, in which he admitted being present with others when Jerry Cook stabbed .the victim. The officers assembled a photographic array, including a photograph of Cook, and the defendant identified Cook's photograph as being [that of] the perpetrator.

"In the meantime, the officers had determined that Cook had been incarcerated at the time of the homicide and, therefore, could not have committed it. They confronted the defendant with this information. The defendant said that he had lied to get some consideration in the Pagan robbery. But on the basis of the information the defendant had already provided, the officers were persuaded that the defendant had been at the homicide scene. They refused, however, to provide the defendant with the details that so persuaded them.

"The defendant then began taking the tack that he had not divulged anything to his questioners; he became incommunicative. He was fidgety and upset. Holt moved closer to the defendant, asking him what was wrong. The defendant became more emotional, crying. The officers tried to calm him down, and Holt put his arm on the defendant's shoulder, reassuring him. They took a break so the defendant could compose himself. The defendant did and then told the officers a second version of the Tarnowski homicide.

"The defendant substantially stated that in the evening or early morning hours of April 11, 1999, he was on the streets in the south end of Stamford where he eventually encountered the victim. The defendant stated that he attempted to disengage himself from a grappling encounter with the victim, but that the victim

had persisted. It was at about this point, the defendant stated, that he pulled out a knife and twice stabbed the victim. The defendant then fled the area and threw the knife off of a bridge. This essentially concluded the defendant's final version of the events that night. After this, the officers developed several details of the homicide with the defendant, including the use of diagrams.

"The defendant then agreed to go with the officers, in their car, to the area of the crime scene to show them where it had happened and what route he had taken in his flight therefrom, and also where he had disposed of the knife. Following this, they returned to the police department and the interview room. They asked the defendant more questions, which he answered. The defendant also described the knife he had used to stab Tarnowski. The officers then began to prepare for the taking of a written statement from the defendant at about 7:40 p.m. They advised the defendant of his rights in written form, had the defendant read one or more of these rights aloud and the rest to himself. He initialed the rights and a waiver of them. The officers then began taking the defendant's written statement, asking him questions as it was typed. When the statement was done, the defendant was given it to review and the opportunity to 'edit' it. The defendant remarked that the statement made him look like a liar because of his earlier, false version of events. The defendant finally initialed and signed the statement. It was completed at approximately 11:27 p.m. The defendant, who had asked to call his mother about one-half hour before, called her. The defendant was then arrested for the murder of Tarnowski and returned to his cell. The following morning, Saturday, June 26, the defendant and several officers went to the vicinity of the Pulaski bridge in Stamford, which had been identified as the bridge from which the defendant threw the knife. The police performed several ground searches for the knife,

with no success in recovering it. A later dive search also did not recover the knife."

The court further found the following facts: "The defendant [at the time of the confession] was seventeen years old and in high school. He did not appear to be under the influence of any substance or of fatigue. The rights were given in English, the language which the defendant spoke and read. He also knew how to invoke those rights, especially his right to remain silent. At the scene of the arrest, Officer Merenda advised the defendant of his rights and then asked him some questions, which the defendant answered. At some point, however, the defendant responded, 'I don't want to talk to you anymore.' . . .

"[T]he defendant was given his *Miranda* rights a second time during his booking at the police department. He was not immediately interrogated again. After a five hour interval, the defendant was [taken to an interrogation room] for questioning by different officers. He voluntarily answered their questions. At no time did the defendant do anything which indicated that he wished to invoke his rights. To the contrary, the evidence shows that the defendant had some degree of self-savvy because, when he was asked about the south end homicide, he inquired, 'What will you do for me?' The defendant admitted to the officers that he had been involved in other robberies. He had been arrested and advised [of his *Miranda* rights] once before on an unrelated matter. He had some degree of familiarity with the legal system. . . .

"Further, the circumstances of the defendant's interrogation were not oppressive. Throughout the course of the day, June 26, the defendant was in different places: a cell, an interrogation room or in a police car driving through Stamford. The interrogation room appears to have been of moderate size, about the same

of that of a jury box. The defendant was seated in the room and was handcuffed by one hand to his chair, the other arm was free. There were generally no more than two officers present with him at any time. He was free to use a rest room; he was offered, and did partake of, food and drink. He made no complaints. He asked for his mother only once, before the very conclusion of his final written statement. He made no objection to the officer's response that he delay that call until they were finished. It is true that the defendant lost his composure before making his final written statement to the police. This was after the defendant had been caught in earlier lies and had parried with the police to divulge incriminating information. However, he eventually regained his composure prior to making his final statement. He was willing and cooperative."

The court also found that the defendant had well below average intelligence, having a verbal IQ of seventy-four and a full scale IQ score of fifty-nine in 1996. Once the defendant began talking to the officers, however, he showed no hesitancy to speak, and his answers were in narrative form. During his time with the police, over many hours, the police were attentive to his basic needs and requests. The court found the defendant's statement did not appear to be motivated by coercive police tactics or by police promises or overreaching.

The court concluded that the defendant knowingly and voluntarily had waived his *Miranda* rights and that he voluntarily gave the statement to the police.

A

"[T]o show that the defendant waived his privilege against self-incrimination, the state must prove by a preponderance of the evidence that he knowingly and intelligently waived his constitutional right to remain silent. . . . The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily

waived the rights delineated in the *Miranda* case. . . . [T]he question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . The issue of waiver is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation." (Internal quotation marks omitted.) *State* v. *Jacques*, 53 Conn. App. 507, 514–15, 733 A.2d 242 (1999).

"The burden upon the state to prove a valid waiver of *Miranda* rights is proof by a fair preponderance of the evidence and not proof beyond a reasonable doubt. . . . In considering the validity of this waiver, we look, as did the trial court, to the totality of the circumstances of the claimed waiver." (Citations omitted; internal quotation marks omitted.) *State* v. *Hafford*, 252 Conn. 274, 296, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

After a careful review of the evidence, we uphold the court's factual findings and its conclusion that the

defendant knowingly and intelligently waived his *Miranda* rights. The evidence established that the defendant was apprehended as he fled the scene of the Pagan robbery with two other men and that he was identified by Pagan as one of the men who attempted to rob him. When arrested, the defendant was advised of his *Miranda* rights, and he acknowledged that he understood his rights. The defendant then admitted to being at the scene of the Pagan robbery, but denied that he was involved, instead blaming the two others who were there. He later stated that he did not want to talk any further to the police officer.

The defendant then was brought to the police station and again advised of his *Miranda* rights, which he acknowledged understanding in writing. He subsequently was interviewed by other officers and stated that he was with his two brothers and a friend when he noticed Pagan walking onto Spruce Street. One of the individuals with the defendant stated, "Let's get him," and the group ran after Pagan. The defendant admitted that once they caught up to him, he punched Pagan in the head and searched his pockets, but found nothing. Pagan broke free from his attackers, fled along Spruce Street, and ran to the front porch of a house and began yelling or knocking on the front door. Afraid of being apprehended, the group ran to the Fairfield Court housing complex, where it was located by Officer Dogali and the defendant was apprehended. During an interview with the police, the defendant admitted that he had been committing robberies since he was sixteen years old and could remember that he had been involved in eight prior robberies.

After the defendant's oral statement as to the robbery, Holt and Luppinacci took a written statement from the defendant. Prior to the taking of that statement, the defendant again was informed of his *Miranda* rights, and he signed and initialed a written rights waiver form.

The officers then prepared a written statement concerning the Pagan robbery. When the written statement was complete, it was shown to the defendant for his review. The defendant read the statement, placing his initials after each paragraph to indicate that he read the statement. After the defendant read the statement, he initialed the statement, attesting that it was given voluntarily after being advised of his rights. The written statement, which began at 1:05 p.m., concluded at 2:21 p.m., with the defendant signing the statement.

Once the written statement was complete, Sergeant Luppinacci asked the defendant if he knew of any other criminal activity or if he had any knowledge of a stabbing that had occurred in Stamford's south end. Luppinacci, the lead detective investigating the unsolved Tarnowski homicide that occurred in April, 1998, asked this question of many who were arrested. After a short delay, the defendant asked Luppinacci what he could do for him if he provided any information. Luppinacci told the defendant that he could not personally do anything to help him, but that the sergeant would tell the prosecutor that the defendant had cooperated. The defendant then told Luppinacci that he learned about the stabbing from Alicia Cobb. When Luppinacci asked the defendant if he would mind if the police spoke with Cobb to verify his information, the defendant stated that Cobb did not tell him what had occurred, and that he was present and had observed the stabbing.

The defendant told Luppinacci that on the evening of April 11, 1999, he attended a dance at the local YMCA and left with several individuals, including Jerry Cook and Jamal Grant. While the group members were walking in the area of Atlantic Street, they saw the victim, and Cook yelled, "There's that guy," meaning the man who Cook had robbed the previous day. The group proceeded to walk toward the victim. The victim then began calling the group racial names, whereupon Cook

said that he was going to hurt the victim. Cook then pulled out a knife and stabbed the victim several times.

Luppinacci gave this information to Sergeant Richard Caldwell. Caldwell, who had arrested Cook earlier, checked the police database and learned that Cook was incarcerated on April 11, 1999, when the homicide occurred. The defendant subsequently was confronted with this information.

Upon being informed that Cook could not have been involved in the stabbing, the defendant dropped his head and said that he had made up the story to get some consideration on the robbery charge. On the basis of the information that the defendant gave to the police concerning the Tarnowski murder, the police believed that the defendant had further information and continued asking him questions. At one point in the questioning, the defendant began to cry, but then composed himself. After two hours, the police told the defendant that if he did not have any further information to give them, they were going to take him to the cell block. At this point, the defendant confessed.

The defendant gave the following account of the events of April 11, 1999. After attending a dance at a YMCA, the defendant walked around downtown Stamford. While on Atlantic Street, the defendant needed to urinate and went behind a house on the corner of Rockland Place and Atlantic Street. While he was behind the house, the defendant saw the victim. As the defendant returned to the street, the victim followed. The victim then went behind the house. Fearing that the victim was trying to cut him off on the other side of the street, the defendant went behind the house and encountered the victim. Words were exchanged, and the victim grabbed the defendant around the neck by his shirt. The defendant knocked the victim's hand off of his shirt, removed a knife from his pocket and

stabbed the victim two times. He stated that "the first stab [hit] something hard and not feeling that it went in, and that the second stab wound—the second stab immediately thereafter went in like a piece of meat." The victim staggered into a car and the defendant fled, throwing the knife from the Pulaski Street bridge.

During the interview, Officer Holt drew a series of three diagrams of the crime scene, and the defendant identified the location where he stabbed the victim. When the defendant had difficulty describing the street names in the area, he agreed to go with the police to show them the route that he took from the YMCA to the location of the stabbing and the route that he took from the scene. Prior to taking the defendant with them, the police brought the defendant food from McDonald's.

After going to the crime scene, the police took the defendant back to the interview room to have him give a written statement. The statement process began at 7:40 p.m. with the police informing the defendant of his *Miranda* rights, and the defendant reading and initialing a waiver of rights form for the second time that day. While providing the written statement, the defendant ate a slice of pizza. After the statement was completed, it was handed to the defendant for him to review. While reading the statement, the defendant stated that it was "making him look like a liar" because of the several versions of events that he gave. The police told the defendant that the statement did not make him out to look like a liar, but that it reflected a complete version of the day's events. The defendant signed the statement. The defendant's family then was contacted, as he had earlier requested.

It is the defendant's contention that the court improperly failed to consider the totality of the circumstances surrounding the statement he provided to the police. The defendant argues that his mental retardation, his

lack of education, the length of the interrogation and coercive police tactics negated the fact that he signed an express waiver of his rights on two different occasions. We disagree.

The defendant was advised of his *Miranda* rights four times throughout the day. On each occasion, he acknowledged that he understood those rights. Shortly after his arrest and prior to being transported to the police station, the defendant informed Officer Dogali that he no longer wanted to speak to him, indicating that he understood his rights and knew how to invoke them when he wanted to do so. See *State* v. *DaEria*, 51 Conn. App. 149, 167, 721 A.2d 539 (1998). The defendant also signed a written waiver of rights form two times that day. "A defendant's express written and oral waiver is strong proof that the waiver is valid." (Internal quotation marks omitted.) Id.

The defendant, seventeen years old at the time of his arrest, was diagnosed in 1996 as educationally mentally retarded with an IQ of fifty-nine. However, Theresa Telesco, a school psychologist who testified at trial about the defendant's intellectual abilities, stated that an individual's IQ score can be substantially affected by the level of cooperation of the individual tested. The defendant's test report revealed that when he was subjected to the IQ test, he did not fully cooperate and indicated that the results should be interpreted with caution.[2] His school records also indicated that he was in the eleventh grade and had the ability to read. The defendant read the waiver of rights form to the police before he signed the form. When the defendant reviewed his written statement, he made corrections to it, showing that he had the ability to read, and to

---

[2] "We may consider the testimony adduced both at the trial and at the suppression hearing when determining the propriety of the trial court's ruling on a motion to suppress a confession." (Internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 390 n.5, 736 A.2d 857 (1999).

understand the statement and waiver of rights form that he signed.

"Even some degree of mental retardation does not by itself prevent a defendant from knowingly and intelligently waiving his *Miranda* rights. *State* v. *Northrop*, [213 Conn. 405, 418–19, 568 A.2d 489 (1990)] (valid waiver of *Miranda* rights despite evidence that defendant possessed a low intellect and was functioning at a fifth or sixth grade level when he left school); *State* v. *Usry*, [205 Conn. 298, 306–307, 533 A.2d 212 (1987)] (valid waiver of *Miranda* rights despite defendant's young age, low IQ and status as special education student); *State* v. *Boscarino*, 204 Conn. 714, 744, 529 A.2d 1260 (1987) (valid waiver of *Miranda* rights despite testimony that defendant had low IQ and other deficiencies allegedly rendering him incapable of waiving his rights); *State* v. *Toste*, [198 Conn. 573, 581–83, 504 A.2d 1036 (1986)] (valid waiver of *Miranda* rights despite evidence that defendant operated at sixth or seventh grade level, had poor reading skills, had fairly low IQ and suffered from psychological disorder)." (Internal quotation marks omitted.) *State* v. *DaEria*, supra, 51 Conn. App. 168–69; see also *State* v. *Madera*, 210 Conn. 22, 45–47, 554 A.2d 263 (1989).

With respect to the circumstances surrounding the confession, the defendant was arrested shortly after 6 a.m. and arrived at the police station at 6:40 a.m. The police began questioning him about the Pagan robbery at 11:49 a.m., and he signed a written confession to that robbery at 2:21 p.m.. Thereafter, the defendant was asked whether he had any information concerning a south end homicide. This was the first time that the subject of the homicide was raised, as the earlier interview focused exclusively on the Pagan robbery. The defendant was not a suspect in the Tarnowski homicide at that time. As the court noted, the question was "not reasonably designed to elicit an incriminating

response." At approximately 2:30 p.m., the defendant asked if he could help himself as to the robbery charge if he provided information about the homicide. After being told that the prosecutor would learn of his helpfulness, the defendant falsely accused Cook of being the perpetrator. In so doing, the defendant revealed that he had information that would be known only by someone who had been at the scene, and the officers continued to question him. He previously had been given his *Miranda* rights three times and waived them in writing prior to giving a written statement as to the Pagan robbery. After orally admitting to stabbing Tarnowski and attempting to retrace his steps to and from the crime scene, the defendant began his written confession at 7:40 p.m., and it was completed at 11:27 p.m. Our Supreme Court has stated that "[t]he mere fact that admissions are made by an accused after a long period of interrogation by a police officer does not necessarily mean those admissions are involuntary." (Internal quotation marks omitted.) *State* v. *Lapointe*, 237 Conn. 694, 734, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996). In this respect, we note that the discussion relating to the Tarnowski homicide did not begin as an interrogation of a suspect. As the defendant attempted to help himself with respect to the Pagan robbery, he stated that he had witnessed the Tarnowski homicide. The police then attempted to discover what truthful information the defendant might have.

While being interviewed, the defendant was offered food and drink, and had a meal from McDonald's and a slice of pizza. See *State* v. *Watts*, 71 Conn. App. 27, 40, 800 A.2d 619 (2002). The officers who interviewed the defendant indicated that he did not appear to be under the influence of alcohol or narcotics, nor did he complain of being tired. Id. Although the defendant did become emotional during the interview, a defendant's

emotional state, by itself, does not invalidate a waiver of *Miranda* rights. *State* v. *Downey*, 45 Conn. App. 148, 163, 694 A.2d 1367, cert. denied, 242 Conn. 909, 697 A.2d 367 (1997). At no time did the defendant reveal that he did not understand his circumstances or that he had difficulty communicating with the officers. See *State* v. *Jacques*, supra, 53 Conn. App. 515. Further, there was no evidence to suggest that the police threatened or coerced the defendant. See *State* v. *Hafford*, supra, 252 Conn. 297. Finally, the evidence revealed that the defendant had experience in the criminal justice system, having previously been arrested and informed of his *Miranda* rights. *State* v. *Usry*, supra, 205 Conn. 305–306.

The defendant exhibited self-interest and knowledge of his circumstances as to the Pagan robbery in attempting to accuse Cook of the Tarnowski homicide. When that attempt failed, he confessed to stabbing Tarnowski, but claimed that he did it because Tarnowski initially assaulted him. This conduct illustrates that the defendant knew what he was doing and attempted to serve his own interests as he interacted with the police.

On the basis of the totality of the circumstances, we conclude that the court properly found that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights prior to giving his statement to the police concerning the Tarnowski homicide.

B

"Irrespective of *Miranda*, and the fifth amendment itself . . . any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . The voluntariness of a confession must be determined by the trial court as a preliminary question of fact . . . and we scrutinize the trial court's finding closely to ensure that it comports with constitutional standards of due process. . . .

"We have stated that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . . Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . [W]e review the voluntariness of a confession independently, based on our own scrupulous examination of the record." (Citations omitted; internal quotation marks omitted.) *State* v. *Hafford,* supra, 252 Conn. 298–99.

"Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the federal constitution, however, coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinder,* 250 Conn. 385, 419, 736 A.2d 857 (1999).

In its memorandum of decision, the court concluded that the "defendant's statement was freely self-determined. His will was not overborne; his capacity for self-determination was not critically impaired." We conclude that the evidence supports this conclusion.

There was no evidence that the police used threats or coercion in obtaining the defendant's confession. The only comments that the police made to the defendant

during the course of the interview were that if he helped solve the Tarnowski homicide, they would inform the prosecutor that he cooperated. "The defendant was given no specific assurances that giving a statement would affect the outcome of the criminal proceedings. Encouraging a suspect to tell the truth . . . does not, as a matter of law, overcome a confessor's will . . . . Neither is a statement that the accused's cooperation will be made known to the court sufficient inducement so as to render a subsequent incriminating statement involuntary. . . . Several courts have held that remarks of the police far more explicitly indicating a defendant's willingness to make a statement would be viewed favorably do not render his confession involuntary. . . . [A] statement [that the accused's cooperation would be to his benefit] by a law enforcement officer falls *far* short of creating the compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 424.

Further, the circumstances surrounding the statement support the court's holding that the statement the defendant provided to the police was voluntary. We conclude that the defendant's age, education and mental handicap do not necessitate a finding that he did not voluntarily give a statement to the police. The defendant knew how to read and write, and understood his *Miranda* rights and how to invoke them. He signed a rights waiver form two times. He also had prior contact with the criminal justice system. Throughout the interview, the defendant was offered, and accepted, food and drink, and was permitted to use the bathroom when needed. There was no evidence that the police used any improper tactics during the course of his confession. Accordingly, on the basis of the totality of the circumstances, our thorough review of the record reveals that

the court properly found that the defendant voluntarily gave his statement to the police. Having found that the court properly concluded that the state had met its burden of proof, we uphold the court's denial of the defendant's motion to suppress his confession.

## II

The defendant next claims that the court improperly excluded portions of his school records concerning his mental capacity. We disagree.

The following facts and procedural history are relevant to our resolution of the defendant's claim. At trial, the defendant called Telesco, the psychologist at Westhill High School in Stamford, as a witness. Through her testimony, the defendant sought to introduce into evidence, under General Statutes § 52-180, a document titled "Report of Individual Psychological Evaluation" from the defendant's school file. The report related to a series of tests given to the defendant in 1996 as a special education student. The seven tests covered in the report were: (1) the Wechsler Intelligence Scale for Children–Third Edition; (2) the Bender Gestalt Test of Visual Motor Integration; (3) the Vineland Adaptive Behavior Scale–Classroom Edition; (4) the Thematic Apperception Test; (5) Rorschach; (6) sentence completion; and (7) classroom observation.

The state objected, and both parties examined Telesco on voir dire. The document, in bold typeface, stated that the "[s]cores should be interpreted with caution," a warning that Telesco stated was not standard in such reports. This warning followed the observation that the defendant did not cooperate in the testing. Telesco testified that a lack of cooperation could effect the test results and result in a lower score. Telesco also testified that of the seven tests performed, the most reliable were the Wechsler Intelligence Scale for Children and the Vineland Adaptive Behavior Scale

because of their objective basis. Telesco testified that the Wechsler and Vineland tests were more reliable because they utilized objective standards in evaluating results. The Bender Gestalt test did not have the level of reliability of the Wechsler and Vineland tests because of its use of subjective evaluating techniques. Telesco also testified that the Weschsler test was used to determine the defendant's "intellectual ability." Of the tests given, it alone determined a subject's IQ. Thereafter, the court requested Telesco to redact the report, leaving only the material related to the Wechsler and Vineland tests.

The defendant now argues that the redaction of the document, eliminating the results of the Bender Gestalt Test of Visual Motor Integration and the Bender Gestalt's conclusion that the defendant's score of 51 placed him at an equivalent to that of a seven year old, was improper.

Appellate review of the admission of a document under § 52-180 is limited to determining whether the trial court abused its discretion. *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 795, 595 A.2d 839 (1991). With respect to opinions contained in a business record, they would be allowed into evidence if the entrant would be qualified to give the opinion in oral testimony. Id., 799. Among the factors to consider is the relevance of the statements in the business record. Id., 798.

"To gain admission of a document under the business record exception to the hearsay rule, the proponent must show that (1) the document was made in the regular course of business, (2) it was the regular course of business to make such a record, and (3) the record was made when the act, transaction or event occurred, or shortly thereafter. . . . [T]he essential hallmark of admissibility under § 52-180 is the trustworthiness of

the document . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Damon*, 214 Conn. 146, 156–57, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990).

In *State* v. *Damon*, supra, 214 Conn. 157, our Supreme Court found it within the trial court's discretion to admit an autopsy report. In upholding the trial court's determination, our Supreme Court looked to the testimony concerning the three requirements that must be established before a document will be allowed into evidence under the business record exception to the hearsay rule, and to "the nature of the document itself, which [was] a report derived from established routine procedures designed to record *objective* facts and observations . . . ." (Emphasis added.) Id.

In this case, in redacting the proffered document, the court sought to ensure that only those portions that bore an indicia of trustworthiness were admitted into evidence. The document itself stated that caution should be used in interpreting the scores. In light of this, we conclude that the court did not abuse its discretion when it admitted into evidence only that part of the report that was based on objective facts and observations.

Further, the defendant has not shown that it was more probable than not that the redaction of the document affected the verdict. The defendant argues in his reply brief that the Bender Gestalt test "was relevant to demonstrate that [he] did not have the intellectual capacity to make a voluntary confession . . . . The denial of this evidence to the jury excluded substantial support for [his] argument that he was coerced into confessing to a crime that he did not commit." We disagree.

Telesco testified on voir dire that the Wechsler test was used to determine intellectual ability, breaking

intellectual ability down into a few components. It was used to determine a subject's IQ. She also testified that the Bender Gestalt test of visual motor integration tests the subject's ability to copy a symbol or form and also is used to test visual recall. Telesco, the only witness called on the subject, testified that the Bender Gestalt test is not used to determine a subject's IQ. The Bender Gestalt test results appeared in the report in terms of mental age, and are not used to measure a subject's IQ, but his visual perceptual and motor integration skills.

Telesco testified before the jury that the Weschler test was an IQ test and that the normal, or average, IQ was 90 to 100. The redacted report before the jury placed the defendant's full scale IQ at fifty-nine, within the 0.3 percentile of test results. The report thus reflected that the defendant's full score was below the normal and only "at or above the 0.3 percent of his age peers in the standardization sample." The report concluded that the defendant was educationally mentally retarded and that his intellectual functioning was in the deficient range. Using the report and the testimony of Telesco, the jury could conclude, if it wanted, that the defendant's intellectual ability was deficient and that he was mentally retarded. It also could conclude that the defendant's full scale IQ was less than that of 97 percent of his peers in the standardized sample. The jury could also conclude, as the redacted reported stated, that the defendant suffered from severe visual perceptual weakness. We conclude that even if the court improperly redacted the Bender Gestalt test of visual motor integration, that was harmless.

### III

The defendant also claims that the court improperly gave the jury two Chip Smith charges when the court knew that the jury vote was ten to two in favor of conviction. We disagree.

The following facts are needed for our resolution of the defendant's claim. The jury began deliberations on November 22, 2001. On the first day back after a holiday recess, the jury sent a note to the court indicating that it had discounted the murder charge and was deliberating on the lesser included offense of manslaughter, but was deadlocked, with ten jurors voting guilty and two jurors voting for acquittal. After hearing argument from the defendant and the state, the court gave the jury a Chip Smith charge.[3] On the following day, the jury sent

---

[3] The court instructed as follows: "Ladies and gentlemen, I am going to give you a further legal instruction, which you are duty bound to follow. I believe that it is an appropriate legal instruction, and as I have said before, you must take the law as I give it to you. You should understand, though, that in giving this instruction, *I am in no way suggesting or intimating to you that the position of the majority or the position of the minority is wrong.* So, having said that, please keep this in mind. The court feels that this matter has been well tried. You have heard the evidence, and the court is of the opinion that it should give you these additional instructions regarding this matter to see whether or not it is within your reach to arrive at a verdict in this matter.

"So, with this in mind, the court wishes to state to you at the outset that *these additional instructions are not to be construed by you to be coercive in any manner or to compel you to arrive at a verdict. The instructions are designed to aid you in considering your own positions individually in weighing your individual positions against the collective position or the position of other members of the jury and, after having done so, to reconsider whatever conclusions that you may have individually reached. Not to suggest to you in any manner that you are compelled to reach a verdict or must reach a verdict.*

"The instruction that I shall give you now is only to provide you with additional information so that you may return to your deliberations and see whether you can arrive at a verdict. Along these lines, the court would like to state the following to you. *Although the verdict to which each of you agrees must express his or her own conclusion and not a mere acquiescence in the conclusion of your fellow jurors,* yet in order to bring your minds to a unanimous result, you should consider the question you have to decide not only carefully, but also with due regard and deference to the opinions of each other. In conferring together, you ought to pay proper respect to each other's opinion and listen with an open mind to each other's argument.

"If much the larger number of you reach a certain conclusion, as in this case you have told me by your note you have, a dissenting juror or jurors should consider whether his opinion or her opinion is a reasonable one when the evidence does not lend to a similar result in the minds of so many

a second note to the court, indicating that it still was deadlocked. The court, over the defendant's objection, gave a second Chip Smith charge to the jury.[4] After

of you who are equally honest and equally intelligent with yourself; who have heard the same evidence with the same attention, with equal desire to arrive at the truth and under the same sanction of the same oath.

"If the majority of you are for one decision, as again your note has indicated you are, the minority ought seriously to ask themselves whether they may not reasonably or ought not to doubt their own conclusions when they are not concurred in by most of those with whom they are associated, and they may well distrust the weight or sufficiency of the evidence upon which they rely when it fails to bring the minds of their fellow jurors to the same conclusions that you hold. I have stated this to you in order to get you to further consider in your deliberations the opinions of your fellow jurors. This is all." (Emphasis added.)

[4] The court instructed as follows: "I have your note, of course, and I have reviewed it with counsel. And I would say this to you. From your note and the circumstances presented, I do not believe that further deliberations would be necessarily fruitless. I would say this to you. Any jury verdict must be unanimous, and any future jury would have the same unanimity requirement. I am duty bound to give to you the following instruction, which you must accept, as I have asked you to accept all of my instructions. *This again is not meant to indicate that the court thinks the position of the majority is right or wrong.*

"Previously in my charge, I have said this to you. To support a verdict, it must be a unanimous one. But that did not mean that each juror should pursue his own deliberations and judgment with no regard to the arguments and conclusions of his fellows. Or that having reached a conclusion, he should obstinately adhere to it without a conscious effort to test its validity by other views entertained by other jurors equally wise and justly resolved to do their duty.

"To put it another way succinctly, *although the verdict to which a juror agrees must, of course, be his own conclusion and not mere acquiescence in the conclusion of his fellows,* yet in order to bring twelve minds to a unanimous result, the jurors should examine with candor the questions submitted to them, and with due regard and deference to the opinions of each other. In conferring together, the jury ought to pay proper respect to each others' opinions. The jurors ought *not* to doubt the conclusions of a judgment which is not concurred in by most of those with whom you are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of your fellows.

"So, I am going to ask you to go back to the jury room and discuss this case further once the clerk sends in the exhibits and the information. I would say to you, though, if you reach an impasse, you can so notify the court with a simple statement the you cannot agree or that you have reached an impasse. You may now go back." (Emphasis added.)

deliberating for a day and one half after receiving the second Chip Smith charge, the jury found the defendant guilty of manslaughter in the first degree.

The defendant does not contest the validity of Chip Smith charges in general. Rather, it is the defendant's sole contention that the charges given in this case were unduly coercive because the court knew that the jury vote was deadlocked ten to two in favor of conviction.

"Although a defendant is not entitled to an instruction that a jury may hang . . . he is entitled to a jury unfettered by an order to decide. . . . A jury that is coerced in its deliberations deprives the defendant of his right to a fair trial under the sixth and fourteenth amendments to the federal constitution . . . . Whether a jury [was] coerced by statements of the trial judge is to be determined by an examination of the record. . . . The question is whether in the context and under the circumstances in which the statements were made, the jury [was], actually, or even probably, misled or coerced." (Citation omitted; internal quotation marks omitted.) *State* v. *Spyke*, 68 Conn. App. 97, 116, 792 A.2d 93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002).

"The purpose of the [Chip Smith] instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence. . . . Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 60, 801 A.2d 730 (2002).

"[A] Chip Smith charge, while encouraging a continued search for unanimity, also stresses that each juror's vote must be his [or her] own conclusion and not a

mere acquiescence in the conclusions of his [or her] fellows. . . . The language of the charge does not direct a verdict, but encourages it." (Citation omitted; internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 440, 778 A.2d 812 (2001).

"By asking the jurors to consider the views and arguments of others, the court's instructions embodied the very essence of the jury system, which is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. . . . It would defy logic to suggest that a juror should not listen with deference to the views of others, particularly when a majority of the others holds a different view of the case than his own. No juror should possess the blind determination that the verdict shall represent his opinion, deaf to those whose equal intelligence and integrity have brought them to a different place. . . . The charge in the present case, when read as a whole, properly informed the jury that each member had the individual responsibility to consider the opinion of the others *and* to satisfy him or herself of the correctness of his or her opinion and not merely to acquiesce in the conclusion of others." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 441–42.

The fact that the court knew that the jury's vote was ten to two in favor of conviction does not render the court's Chip Smith instructions unduly coercive. When the vote tally is disclosed to the court voluntarily and without solicitation, the fact that the court knew of the split before giving a Chip Smith charge does not constitute error. Id., 443 n.6; see also *United States* v. *Meyers*, 410 F.2d 693, 697 (2d Cir.), cert. denied, 396 U.S. 835, 90 S. Ct. 93, 24 L. Ed. 2d 86 (1969); *United States* v. *Sawyers*, 423 F.2d 1335, 1340 (4th Cir. 1970); *United States* v. *Cook*, 663 F.2d 808, 809 n.3 (8th Cir. 1981).

When read as a whole, the court's instructions to the jury, including the two Chip Smith charges, were not unduly coercive. The court clearly stated that each juror's individual vote must be based on his or her own conclusion and not on mere acquiescence to the conclusion of other jurors. In the second Chip Smith charge, after which a verdict was returned, the court charged the minority jurors that they were *not* to doubt their position because it was contrary to that of the majority. Accordingly, after our careful review of the record, we conclude that the court's charge was proper.[5]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] We note that our Supreme Court has exercised its supervisory powers over the administration of justice to require trial courts to use a Chip Smith charge that emphasizes the jurors' duty not to merely acquiesce in the majority's view. *State* v. *O'Neil,* supra, 261 Conn. 74–75.