TRAVIS WRIGHT *v.* COMMISSIONER
OF CORRECTION
(AC 32941)

Gruendel, Keller and Dupont, Js.

Argued March 18—officially released June 11, 2013

*Ilana Ofgang*, assigned counsel, for the appellant (petitioner).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Marcia A. Pillsbury*, special deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

KELLER, J. The petitioner, Travis Wright, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the habeas court abused its discretion when it denied the petition for certification to appeal and that it improperly rejected his claims that (1) his trial counsel failed to provide him with effective assistance; (2) his confession, evidence of which was admitted at his criminal trial, was untrustworthy; (3) his appellate counsel failed to provide him with effective

assistance; and (4) newly discovered evidence demonstrated his actual innocence. Because we conclude that the habeas court properly denied the petition for certification to appeal, we dismiss the appeal.

Following a jury trial, the petitioner was convicted of manslaughter in the first degree in violation of General Statutes § 53a-55 (a). The court sentenced the petitioner to serve a term of incarceration of seventeen years. This court affirmed the judgment of conviction. *State* v. *Wright*, 76 Conn. App. 91, 818 A.2d 824 (2003), cert. denied, 267 Conn. 911, 840 A.2d 1175 (2004).[1]

At the petitioner's criminal trial, the state presented evidence that at approximately 4 p.m. on April 11, 1999, police responded to a report of a sick or injured person in the vicinity of Rockland Place and Atlantic Avenue in Stamford. There, officers discovered the deceased victim, Wieston Tarnowski, a Polish national who had emigrated to the United States. The victim was found on his back on the reclined passenger seat of an automobile that was located behind a residential structure. The passenger door of the automobile was open, and the victim's leg extended outside of the automobile. The victim was partially covered with a blanket. The victim exhibited facial injuries, and an autopsy performed by the medical examiner revealed that the victim, who was heavily intoxicated at the time of his death, was stabbed twice in the chest. One stab wound extended through the victim's chest cavity into one of his lungs. The other stab wound was not as deep, penetrating only as far as the victim's breast bone.

---

[1] Among the claims addressed in the petitioner's direct appeal, this court rejected the petitioner's claim that the trial court improperly denied his motion to suppress his confession. *State* v. *Wright*, supra, 76 Conn. App. 93–111. This court concluded that the confession was voluntarily given in accordance with due process and that the petitioner had knowingly, intelligently and voluntarily waived his *Miranda* rights; see *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); prior to giving his statement to the police. *State* v. *Wright*, supra, 93–111.

On the morning of June 24, 1999, the petitioner, then seventeen years of age, was apprehended and taken into custody by the Stamford police in connection with an unrelated attempted robbery incident. Concerning this incident, the petitioner was interviewed at the police department, primarily by Officer Gregory Holt. By early afternoon, the petitioner finished providing a sworn, written statement to the police in which he confessed to his involvement in that attempted robbery.

After the petitioner finished providing a statement with regard to the attempted robbery incident, Holt left the interview room briefly. At this time, Stamford police Sergeant Anthony Lupinacci asked the petitioner if he had any information about a stabbing that had occurred in the south end of Stamford. Lupinacci typically posed this question to arrestees in an effort to gain information related to the unsolved crime. The petitioner replied, "What are you going to do for me?" Lupinacci responded that he could speak with the prosecutor on his behalf.

The petitioner told Lupinacci that he had information about the stabbing. He then provided the police with some accurate information about the crime, information not known publicly, but initially he did not implicate himself in the victim's death. There was evidence that, apart from referring to the fact that a stabbing had occurred in the south end of Stamford, the police did not provide the petitioner with other information concerning the crime. First, the petitioner stated that he had information about the stabbing by way of a friend, Alicia Cobb. When the police indicated that they intended to contact Cobb, the petitioner changed his story and said that he was present at the stabbing. He stated that, on the night of the stabbing, he was at a dance with friends, including a person named Jerry Cook. After the dance, he was walking with approximately ten other people, including Cook, in the south end of Stamford when someone in the group identified

the victim as a person whom they had robbed a day or two earlier.[2] The petitioner stated that Cook approached the victim and stabbed him two to three times while the petitioner and others, including a person named Jamal Grant, were present.

After hearing this version of events, the officers interviewing the petitioner prepared a photographic array from which the petitioner accurately identified a photograph of Cook. Then, Lupinacci informed the petitioner that Cook was imprisoned on the date of the stabbing and, therefore, could not have been present at the crime scene. The petitioner reacted by putting his head down and stating that he had fabricated this version of events.

Ultimately, Lupinacci left the interview room, but Holt continued to interview the petitioner concerning the stabbing. During portions of the interview process, Holt was joined by another Stamford police officer, John Lynch. At one point during the process, the petitioner, after being told that his initial accounts of what transpired were untrue, was informed by the officers that the stabbing was fatal. The petitioner reacted by crying openly and, soon thereafter, confessed that he stabbed the victim. By 11:27 p.m., the petitioner completed a sworn and written statement in which he implicated himself as the perpetrator of the victim's death. Holt prepared the typewritten statement based on information provided by the petitioner. Later, the petitioner was asked to review the statement. When he was satisfied that it was accurate, he inscribed his initials at the beginning and end of each paragraph and signed it.

The statement provided, in relevant part, that after leaving a dance at a local YMCA, the petitioner walked alone to the area of Atlantic Avenue and Rockland Place on the way to his cousin's residence, where he planned

---

[2] There was evidence that, on April 9, 1999, the victim received emergency room treatment for injuries and intoxication.

to spend the night. He walked behind a house intending to urinate, at which time he encountered the victim, who spoke with an accent and said something to the petitioner that he could not understand. The victim grabbed the petitioner, but the petitioner walked away. The petitioner then walked back behind the house, where an automobile was located, at which time the victim grabbed the petitioner and began to choke him. In an ensuing struggle, the petitioner, who believed he was in physical danger, removed a knife, approximately six inches in length, from his pants and stabbed the victim twice in the chest. The stabbing occurred near the automobile on April 11, 1999, at approximately 2 a.m. Thereafter, the petitioner fled the crime scene.

While explaining his version of events to the police, the petitioner, using a ruler in place of the knife and Lynch in place of the victim, physically demonstrated his actions in stabbing the victim. He said that the first stab, in the middle of the victim's chest, struck something hard, but that the second stab "went in like a piece of meat." This description was entirely consistent with the medical examiner's report concerning the victim's fatal injuries. The petitioner told the police that the stabbing occurred in the vicinity of a store that was known by the fact that a dog frequently roamed on its roof. He also told the police that the stabbing occurred behind a residence, near the right side of an automobile that was older and in poor condition.

Holt drew diagrams of the crime scene at different points during the interview process. These diagrams corresponded to descriptions of the crime scene that were being described by the petitioner; they included the location of streets, structures, an automobile and persons. Holt testified that the petitioner was able to describe locations, routes and landmarks, but that he was unfamiliar with street names. On each diagram, the petitioner marked and initialed the diagram to indicate

where the stabbing occurred. Holt drew these diagrams with the petitioner's input, but the petitioner made markings on the diagrams to identify his location and the location of other persons at the time of the stabbing.

The first diagram was drawn before the petitioner confessed to the crime. It depicts streets and structures in the vicinity of Atlantic Avenue and Rockland Place. Among other things, it depicts the store characterized by the dog on its roof as well as the residence near this location, behind which the stabbing occurred. The petitioner drew a square behind the residence to depict the location of the automobile where the victim was stabbed. The petitioner labeled this as a "car" and wrote his initials near it on the diagram. A second diagram is consistent with the petitioner's second version of events and was drawn before the petitioner confessed to the crime. It depicts the residence and the automobile as well as the location of Cook, Grant, the petitioner and others, including the victim, all of whom are near the automobile. A third diagram was drawn after the petitioner implicated himself in the crime. It is consistent with the petitioner's confession, and depicts the residence, a garage and the automobile. It is marked to indicate the location near the automobile where the confrontation took place, as well as the locations of the petitioner and the victim at that time.

Prior to signing his sworn statement, the petitioner accompanied Holt and Lynch, in an unmarked police cruiser, to the area of the crime scene. The petitioner directed Lynch, who was operating the police cruiser, with regard to the path he traveled on the night of the stabbing. The petitioner identified the crime scene and directed the officers to the area in which the stabbing occurred behind a residence, but not to the precise location at which the victim's body was later discovered. After leaving the crime scene, the petitioner identified a bridge as the location from which he discarded

the knife he used to stab the victim. Later, after police informed the petitioner that they would attempt to recover the knife from the river under the bridge, the petitioner indicated that he had not thrown the knife into the river. The following day, the police transported the petitioner to the bridge once again because the petitioner told the police that he would show them where he put the knife. The search for the knife, however, was not successful.

The prosecutor argued before the jury that the evidence concerning the petitioner's confession demonstrated that the petitioner immediately tried to benefit himself when asked about the stabbing. Initially, he provided credible and accurate information concerning the crime, but had a difficult time concealing his own involvement in the crime. The prosecutor argued that the petitioner was streetwise and that his confession was corroborated by the information he provided about the crime itself, especially the manner in which the victim had been stabbed.

The petitioner's trial attorney, Joseph A. Moniz, relying on evidence concerning intelligence testing of the petitioner,[3] referred to him as a "seventeen year old mentally retarded boy"[4] who, after being apprehended in the robbery incident, fabricated a confession in the stabbing case to benefit himself. Moniz vigorously cross-examined the police concerning the petitioner's interrogation. Later, he argued that the petitioner was promised a benefit for providing such information, that

---

[3] At trial, the petitioner presented evidence that, in 1996, he obtained a score of fifty-nine on an intelligence test administered by school officials, which placed him in "the [e]ducationally [m]entally [r]etarded range." A school psychological evaluation report concerning the petitioner reflected among other things that the petitioner appeared to have "severe visual-perceptual weaknesses . . . ."

[4] We refer to the term "mentally retarded," rather than the more acceptable term "developmentally disabled," because we are quoting the language used by the participants in the underlying criminal trial and the habeas trial.

he was "trapped" into confessing and that the confession was the result of a suggestive and threatening police interrogation.

Moniz presented evidence at trial that the victim was intoxicated to such an extent at the time of his death that he could not have behaved in the manner described by the petitioner. Furthermore, he attempted to demonstrate that the confession was contradicted by uncontested physical evidence related to the crime scene. Moniz emphasized that the evidence supported a finding that the victim was stabbed inside of the automobile and that his time of death was inconsistent with the petitioner's version of events. Furthermore, Moniz argued that the diagrams drawn by Holt were Holt's diagrams, not those of the petitioner. He argued that, insofar as they did not accurately reflect the location of the automobile in which the victim was found as well as the presence of a boat that figured prominently at the crime scene, they were factually inconsistent with the crime scene and, thus, reflected that the statement was not trustworthy. Moniz argued that they merely were Holt's "suggestion to [the petitioner] of what happened." For his part, the prosecutor responded that, if the police were trying to provide information to the petitioner concerning the crime scene, as the defense suggested, the diagrams consequently would have been far more accurate in terms of depicting the crime scene.

On October 6, 2010, the petitioner filed an amended petition for a writ of habeas corpus. In count one of the amended petition, the petitioner claimed that his due process right to a fair trial was violated because his confession, evidence of which was presented at trial, was uncorroborated and, thus, untrustworthy. In counts two and three, the petitioner claimed that, in

various ways, Moniz failed to provide effective assistance in connection with the criminal trial[5] and the direct appeal.[6] In the fourth and final count, the petitioner claimed that someone else killed the victim and, thus, he was actually innocent.

In his return, in response to the petitioner's amended petition, the respondent, the commissioner of correction, denied that the confession was not trustworthy

[5] In his amended petition for a writ of habeas corpus, the petitioner alleged in relevant part: "The petitioner's trial counsel's performance was deficient because . . .

"(B) he failed to have the petitioner evaluated by a forensic psychiatrist,

"(C) he failed to have the petitioner evaluated by a forensic psychologist . . .

"(P) he failed to challenge the admissibility of the petitioner's confession on the basis that it was not trustworthy, under the corroboration rule of *Opper* v. *United States*, 348 U.S. 84 [75 S. Ct. 158, 99 L. Ed. 101] (1954), *State* v. *Harris*, 215 Conn. 189 [575 A.2d 223] (1990), and *State* v. *Hafford*, 252 Conn. 274 [746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89] (2000) . . .

"(T) he failed to adequately cross-examine, impeach, and otherwise discredit Sergeant Anthony Lupinacci during the criminal trial . . .

"(V) he failed to adequately cross-examine, impeach, and otherwise discredit Officer Gregory Holt during the criminal trial,

"(W) he failed adequately to present evidence of the facts and circumstances of the interrogation of the petitioner during the criminal trial,

"(X) he failed to adequately present evidence of the petitioner's mental state at the time of the confession during the criminal trial,

"(Y) he failed to present the testimony of a forensic psychiatrist that had evaluated the petitioner during the criminal trial,

"(Z) he failed to present the testimony of a forensic psychologist that had evaluated the petitioner during the criminal trial,

"(AA) he failed to present the testimony of Dr. Richard Leo, or some other similar police interrogation and false confessions expert, during the criminal trial . . .

"(EE) he failed to request a jury instruction regarding the trustworthiness of the petitioner's confession, under the corroboration rule of *Opper* v. *United States*, [supra, 348 U.S. 84], *State* v. *Harris*, [supra, 215 Conn. 189], and *State* v. *Hafford*, [supra, 252 Conn. 274], and

"(FF) he failed to [raise a claim before the trial court related to the untrustworthiness of the petitioner's confession]."

[6] The petitioner alleged, in relevant part, that Moniz was deficient in that he failed to raise a claim on direct appeal related to the untrustworthiness of the confession.

and, in the alternative, argued that the claim was barred by the doctrine of res judicata, as it had been adjudicated in the petitioner's direct appeal. The respondent denied that Moniz had rendered ineffective assistance at the trial or appellate level. Further, the respondent denied the claim of actual innocence and asserted that no newly discovered evidence existed. In his reply to the return, the petitioner argued that res judicata did not bar consideration of any of the claims raised. With regard to the fourth count, the petitioner alleged, in relevant part, that the court could grant relief in the absence of newly discovered evidence.

Following an evidentiary hearing, the habeas court orally delivered its decision denying the petition for a writ of habeas corpus.[7] The court rejected the claim that the petitioner's confession was not trustworthy. The court, having found that the confession was sufficiently trustworthy, rejected the petitioner's ineffective assistance of counsel claims related to the admissibility of the confession. Also, the court rejected the petitioner's claims related to trial counsel's trial strategy in challenging or discounting the weight to be afforded the petitioner's confession. The court rejected the actual innocence claim on the ground that the petitioner failed to present any newly discovered evidence in support of his claim. Later, the court denied the petitioner's petition for certification to appeal. A more in depth recitation of the court's findings of fact and its analysis will be set forth in the context of the claims raised in this appeal.

"We begin by setting forth the applicable standard of review and procedural hurdles that the petitioner must surmount to obtain appellate review of the merits

---

[7] Subsequently, the court filed a signed transcript of its decision in accordance with Practice Book § 64-1 (a).

of a habeas court's denial of the habeas petition following denial of certification to appeal. In *Simms* v. *Warden*, 229 Conn. 178, 187, 640 A.2d 601 (1994), we concluded that . . . [General Statutes] § 52-470 (b) prevents a reviewing court from hearing the merits of a habeas appeal following the denial of certification to appeal unless the petitioner establishes that the denial of certification constituted an abuse of discretion by the habeas court. In *Simms* v. *Warden*, 230 Conn. 608, 615–16, 646 A.2d 126 (1994), we incorporated the factors adopted by the United States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), as the appropriate standard for determining whether the habeas court abused its discretion in denying certification to appeal. This standard requires the petitioner to demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . A petitioner who establishes an abuse of discretion through one of the factors listed above must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 657–58, 16 A.3d 676 (2011). Having set forth the standard of review, we consider the merits of the petitioner's underlying claims.

I

The petitioner claims that the court improperly concluded that Moniz' representation at trial was not deficient despite the fact that he failed to have him

evaluated by a forensic psychiatrist and a forensic psychologist. Also, he claims that the court improperly concluded that Moniz had not rendered ineffective assistance at trial despite the fact that he failed to present testimony related to false confessions from Richard Leo, an expert witness retained by the defense at the time of trial. The petitioner alleged that had Moniz taken these steps at trial, they would have cast doubt on his confession and affected the outcome of the trial.

At the habeas trial, the petitioner presented testimony from Holt and Lupinacci concerning, as relevant, the circumstances surrounding the petitioner's confession. As he did at trial, Holt testified that he was unfamiliar with many of the facts related to the victim's death, but was aware that it resulted from two chest wounds. The diagrams were in evidence, and Holt described the manner in which the diagrams were drawn during the petitioner's interview. He stated that the petitioner was easily acclimated to the diagrams, did not hesitate in identifying locations on the diagrams, did not appear to have any difficulty in using the diagrams and "[a]bsolutely" appeared to understand what the diagrams represented. Holt testified that it was clear to him that the petitioner understood all three of the diagrams as well as the relationship between objects depicted in the diagrams.

Moreover, Holt testified that he did not believe that any unintentional contamination occurred here and that it appeared to him that the petitioner became emotional when he ultimately confessed, having learned from the police that the victim was dead. Holt acknowledged in his testimony that many of the events described by the petitioner were unlikely to be true, as the evidence strongly suggested that the victim was stabbed while he was inside of the automobile. Likewise, Holt testified that he was persuaded that the petitioner truthfully implicated himself in the crime because of the accurate

information in his statements, information that included references to landmarks near the crime scene, the two distinct stab wounds sustained by the victim, the fact that the victim spoke with an accent and the fact that the crime occurred near an automobile at the physical location he described. Both Holt and Lupinacci testified that, consistent with their police training, they were careful not to unintentionally provide the petitioner with information about the crime during the interview process.

Additionally, during the habeas trial, the petitioner presented testimony from Reena Kapoor, a forensic psychiatrist retained by the petitioner to evaluate him for the purpose of determining whether he had any psychological characteristics or psychiatric illnesses that may have affected the accuracy of his confession in 1999. In relevant part, Kapoor testified that, in conducting her forensic evaluation of the petitioner, she interviewed the petitioner, conversed with the petitioner's mother and reviewed records concerning the petitioner. Additionally, Kapoor relied on the expertise of Madelon V. Baranoski, a psychologist, who administered a variety of tests to the petitioner. Kapoor reviewed materials related to the petitioner's trial, using all of the foregoing information to formulate her opinion.

Kapoor testified that the petitioner's full scale I.Q. of eighty-nine was in "the very bottom of the low average range," his verbal I.Q. was slightly higher and his performance I.Q. was significantly lower, at the "[b]orderline between normal intellectual functioning and mental retardation." She testified that he had, at the time of his confession, and continues to have, a severe deficit in terms of perceptual organization skills, specifically, an inability to accurately perceive where things are in relation to each other. She referred to testing in which the petitioner was asked to review and draw images,

as well as a test in which the petitioner was asked to draw the numbers one through twelve within a round circle, consistent with the placement of numbers on the face of a clock. In the latter test, Kapoor said, the petitioner drew the number twelve in its correct position and drew the other numbers disproportionately on the right side of the clock, such that the number eleven was positioned on the clock face where the number eight should be. Referring to the diagrams of the crime scene generated during the petitioner's interview with Holt, Kapoor opined that the petitioner could not accurately or reliably have drawn the diagrams or directed someone else to draw them. She opined that he lacked the ability accurately to interpret a map or to identify particular places on such diagrams. Kapoor testified that, although the petitioner had learning disabilities at the time of his confession, he did not require psychiatric treatment at that time. She stated that the petitioner was capable of explaining "verbally where things were and that someone else could then interpret that and draw it."

Also, the petitioner presented testimony from Leo, a law professor with expertise in the areas of interrogation, psychological coercion, false confessions and wrongful convictions. In relevant part, Leo opined that people with cognitive impairments, mental illnesses or those who are highly compliant, highly suggestible, weak-willed or submissive, are vulnerable to making false confessions. Leo also opined that there is a risk that police, in coercing a suspect to confess to a crime, unintentionally may "contaminate" the suspect by providing him with facts about the crime that are not generally known by the public. Later, the suspect's reference to these facts, learned only during the course of interrogation, may make his confession appear to be based on his firsthand knowledge of the crime. Leo testified that police techniques are designed to be stressful,

manipulative and deceptive and that, in false confession scenarios, unintentional contamination of suspects occurs frequently.

Leo testified that he reviewed information about the present case that he obtained from Moniz. Leo testified that there was evidence that the police used coercive techniques when they questioned the petitioner by promising him that he could go home if he provided a satisfactory statement, yelling at him, accusing him of committing the crime, confronting him with evidence concerning the crime and providing him with information about the crime. Leo opined that the petitioner learned all of the information about the crime from the police. Leo testified that he was hired by Moniz and that he testified at the suppression hearing prior to the underlying trial. He did not testify at the underlying trial, although he was available to do so.

At the habeas trial, Moniz testified that his theory of defense was that the petitioner did not commit the crime and that his confession was false, given in an attempt to benefit the petitioner in his attempted robbery case. In an attempt to undermine the confession, Moniz decided, as a matter of trial strategy, to focus on the parts of the petitioner's statement that were inconsistent with evidence related to the crime scene and, thus, could not have been true. He stated that he considered several ways of challenging the confession, but ultimately determined that the theory "that made the most sense" was that the version of events that the petitioner set forth could not have been true, not that the petitioner's statement had been contaminated, intentionally or unintentionally, by the police. When questioned about his decision not to simultaneously attempt to demonstrate that contamination occurred, Moniz opined that pursuing more than one theory "sort of look[s] like you don't really have a theory." Moniz

testified that he researched the issue of false confessions in preparing the defense. Moniz testified that, at the time of trial, he relied on a school psychology report concerning the petitioner, but could not recall the portion of it that stated that the petitioner had a deficit related to spatial representation. Moniz stated that he did not pursue having the petitioner evaluated by a psychiatrist or a psychologist, but could not recall why. Moniz could not recall why he did not focus on the petitioner's deficit related to spatial representation when addressing the diagrams made by Holt. Likewise, Moniz could not recall why he did not present testimony from Leo at trial.

In denying the petition for a writ of habeas corpus, the court stated: "[T]he petitioner's claims [regarding Moniz' failure to pursue psychiatric or psychological testing or to call Leo as a false confession expert at trial] merely challenge trial counsel's strategy in contesting the confession. This is not a case in which trial counsel missed the key issue. Moniz filed and vigorously pressed a motion to suppress, even calling Dr. Leo as an expert on false confessions, which was unusual for that time, ten years ago, in our legal history. . . . Moniz then made his main theory of defense at trial to be that the confession was false. What the petitioner is doing now is launching highly technical attacks on the precise strategy that Moniz employed in raising this issue.

"Moniz emphasized . . . the petitioner's apparent mental retardation. The petitioner now says that he should have, instead, emphasized his spatial observation deficits. Moniz claimed that the officers essentially planted the words in the petitioner's mouth, perhaps intentionally. [The] petitioner now claims that Moniz should have instead argued that the officers unintentionally did so.

"These arguments do not establish ineffective assistance of counsel. They certainly do not prove that counsel was not providing valid representation to the petitioner. Instead, they merely constitute attempts to second-guess counsel's trial strategy, given that counsel's efforts eleven years ago did not succeed in getting a complete acquittal, although they did succeed in getting a lesser included offense verdict of manslaughter. . . .

"[First, I will address the claim that] trial counsel should have retained an expert similar to Dr. Kapoor and called [a] similar expert at trial. I would note that there was some evidence of the petitioner's spatial deficits in the school records that [were] admitted before the jury, although admittedly this [deficit] was not emphasized. But more important[ly], the diagrams that were used by Officer Holt were quite simple. And Officer Holt testified credibly that the petitioner understood them. So, there was very little basis to hire an expert on this point.

"Second, in relation to these claims, the petitioner confessed to this murder before making the diagram of the homicide [scene]. So, the diagrams were not the critical part in the petitioner's interrogation. The confession had already come out. Then, after the petitioner did participate with Officer Holt in making the diagram, the petitioner went to the crime scene with the police . . . and gave them additional evidence in that way. Then the petitioner gave a written statement. So, the diagram was only one part of the incriminating evidence that the petitioner gave to the police.

"And I did mean to add with regard to my first point that the diagrams were quite simple and Officer Holt testified credibly that the petitioner understood them—that even Dr. Kapoor admitted that the petitioner could

explain verbally where things were, and that was part of how Officer Holt used the diagram with the petitioner.

"Third, with regard to [this] group of claims, in mounting a defense that the confession was untruthful . . . Moniz emphasized the petitioner's low intellectual ability. This was a strategic decision to emphasize this and not other deficits. So, for example, during closing arguments there were repeated efforts—references, rather—by . . . Moniz to the fact that the [petitioner] was a seventeen year old mentally retarded boy.

"Continuing on in closing argument . . . after . . . developing this sort of theme . . . Moniz does suggest that [one of the diagrams drawn by Holt] 'reflects precisely what Officer Holt knew about what happened.' So, contamination was argued [at trial by Moniz] in that regard. . . .

"[At another point during closing argument at trial, in referring to another diagram drawn by Holt], Moniz argued: 'This is Officer Holt's drawing; his suggestion to [the petitioner] of what happened. And [the petitioner] merely filled in some spots as he circled in the diagram.'

"So, counsel did emphasize the point that the petitioner was vulnerable and led by the officer to fill out the diagram in an incriminating way, which is precisely the ultimate point that the petitioner claims should have been brought out [at trial]. [Moniz] simply emphasized the petitioner's apparent mental retardation rather than his spatial deficits, which was a reasonable choice, given the fact that mental retardation would be understandable to the jury and would explain not only the diagrams but the whole confession. . . .

"With regard to the claims that trial counsel should have retained someone like Dr. Leo to testify at trial and argued the theory of unintentional contamination.

First, it should be noted again that . . . Moniz did call Dr. Leo at the hearing on the motion to suppress . . . .

"And Dr. Leo did testify generally about false confessions, coercion, inducements, and he testified specifically in the suppression hearing that the confession in this case was unreliable. At trial, counsel did present a false confession theory. He relied on factors such as the petitioner's low I.Q., improper inducements, the length of time of the interrogation, [the] petitioner's youth. And, at least according to . . . Moniz' testimony, he did try to show contamination.

"At trial, further . . . Moniz did try to show that the confession was untrustworthy because it was not corroborated. He produced three experts—one concerning blood alcohol levels [of the victim]; one, I believe, concerning the timing of the killing; and one concerning the position of the victim and the blood evidence, to establish that the confession was untrustworthy, unreliable and unbelievable. Failing to add another factor of inadvertent contamination is simply second-guessing strategic decisions concerning what is most important for trial counsel to bring out.

"Second, with regard to the theory of unintentional contamination and Dr. Leo's testimony, there was, in fact, no factual basis for—or clearly an insufficient factual basis for an argument of inadvertent contamination in this case. There was no evidence of inadvertent contamination. Sergeant [Lupinacci] merely introduced the topic of a stabbing in the south end, but it was the petitioner who supplied the street names.[8]

---

[8] We note that the court's finding that the petitioner provided the police with street names is at odds with the evidence. Holt testified that the petitioner was able to describe routes he took to and from the crime scene, as well as landmarks near the crime scene, but was unable to refer to the names of streets relevant to the crime scene. Although the petitioner refers in argument to this erroneous finding of fact, he does not raise a distinct claim of error related to it, and we deem the erroneous finding inconsequential to our analysis.

"Officer Holt's testimony, which I credit, was that [the] petitioner volunteered the information. And Officer Holt himself knew little about the homicide and could not have supplied the information in that confession. The trial court and the Appellate Court found that the atmosphere of the petitioner's confession was not improperly stressful. There was no police coercion. The police were attentive to the petitioner's needs. In addition, the petitioner himself was savvy and clever. He invoked his right to silence. He asked what the police could do for him. He was familiar with the legal system. Despite some deficits, he was not a fool. He decided to lie about Mr. Cook at first and then discovered that he could not get away with it.

"The petitioner was wrong in several respects with regard to the way in which—or at least the location of the body and perhaps with the way in which—the victim's body and the way in which the victim was killed. But this shows that the police did not put words in the petitioner's mouth and negates the theory of even unintentional contamination [of the petitioner by the police]. . . .

"So, I find no ineffective assistance of counsel with regard to the unintentional contamination claims and the claims concerning Dr. Leo. The other claims of ineffective assistance are denied because no evidence or no new evidence was produced to support them. Therefore, I find no ineffective assistance of counsel."

Having set forth the court's ruling, we observe that "[a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* v. *Washington,* [466 U.S. 668, 687, 104 S. Ct.

2052, 80 L. Ed. 2d 674 (1984)], this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied. . . .

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of [the pertinent legal standard to] the habeas court's factual findings . . . however, presents a mixed question of law and fact, which is subject to plenary review." (Citation omitted; internal quotation marks omitted.) *Ebron* v. *Commissioner of Correction*, 307 Conn. 342, 351, 53 A.3d 983 (2012), cert. denied sub nom. *Arnone* v. *Ebron,* U.S. , 133 S. Ct. 1726, 185 L. Ed. 2d 802 (2013).

The petitioner claims that Moniz was ineffective for failing to have him evaluated by a psychiatrist and a psychologist. He claims that Moniz did not know the extent of his mental deficits and that evidence related to the true extent of his spatial perception deficit would have undermined the diagrams that were pivotal in obtaining and corroborating his confession, which was the basis of the evidence against him. With regard to Leo, the petitioner claims that it was objectively unreasonable for Moniz not to present Leo, who already had been retained as an expert witness in connection with

the motion to suppress. He claims that such failure was prejudicial because it would have cast doubt on his ability to provide a valid confession. He argues that testimony concerning his inability accurately to locate the crime scene on the diagrams drawn by Holt and testimony concerning contamination and his susceptibility to false confessions would have changed the outcome of the trial.

As the court properly found, the petitioner's claims are not persuasive because they are directed at Moniz' trial strategy. Contrary to the petitioner's arguments, Moniz was not ineffective simply because he failed to call a witness that he had retained to testify at the hearing on the motion to suppress. Furthermore, he was not necessarily ineffective for failing to subject the petitioner to testing to gauge the extent of his mental deficits. At trial, Moniz unambiguously attempted to demonstrate that the petitioner's confession was false. He did so by eliciting a great deal of testimony concerning the petitioner's interrogation as well as his mental disabilities. He conducted lengthy and comprehensive cross-examinations of all three police officers involved in procuring the confession, during which he probed the circumstances of the interview, the petitioner's vulnerability, inducements presented to him, contamination and inaccuracies in the diagrams and the petitioner's statement. Additionally, Moniz attempted to demonstrate, through evidence, including expert testimony, and argument before the jury, that the confession simply was at odds with other evidence. Moniz' testimony at the habeas hearing reflects that Moniz believed that this was a sound trial strategy; he explained that he believed it was better to raise arguments related to the petitioner's mental deficiencies generally, the fairness of the interrogation as a whole and by drawing attention to the many elements of the confession that were at odds with the other evidence

in the case. "[T]here is a strong presumption that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment . . . . It is well established that [a] reviewing court must view counsel's conduct with a strong presumption that it falls within the wide range of reasonable professional assistance and that a tactic that appears ineffective in hindsight may have been sound trial strategy at the time." (Citation omitted; internal quotation marks omitted.) *Boyd* v. *Commissioner of Correction*, 130 Conn. App. 291, 298, 21 A.3d 969, cert. denied, 302 Conn. 926, 28 A.3d 337 (2011).

Furthermore, even were we to conclude that such a strategy constituted ineffective assistance, we are not persuaded that it prejudiced the petitioner. Moniz strenuously argued that the confession was false because the petitioner was "mentally retarded,"[9] the police used a variety of unfair tactics to secure it and because it contradicted other evidence. Although Moniz did not present testimony from either a forensic psychiatrist or a forensic psychologist concerning the existence and nature of the petitioner's spatial perception deficit, Moniz nonetheless presented evidence of such deficit at trial. The school psychological evaluation, authored by a psychologist, stated that the petitioner had "[a] severe visual-perceptual weakness." Additionally, there was ample evidence, apart from the diagrams drawn by Holt, that strongly tied the petitioner to the crime. There was testimony that the petitioner verbally and accurately described the physical location of the crime scene and the manner in which he stabbed the victim in the chest. During the interrogation, he physically demonstrated for the police the manner in which he stabbed the victim. Also, in an unmarked police cruiser, he directed the police to the physical location of the

[9] At the habeas trial, Moniz testified that he did not believe that the petitioner was "mentally retarded . . . ."

crime scene. There was no evidence that the petitioner, due to a spatial perception deficit, was unable accurately to convey such information to the police in these manners. Insofar as the diagrams could be viewed as an important aspect of the interview process, as the petitioner suggests, the habeas court reasonably found that the simplicity of the diagrams and the evidence about the ease with which the petitioner interacted with them heavily weighed against the testimony that the petitioner was unable to use them in a meaningful way. The court reasonably credited the police testimony that the petitioner did not have difficulty providing the police with the information contained in the diagrams.[10]

Additionally, we are not persuaded that Leo's testimony would have affected the jury's view of the evidence. Although the gravamen of Leo's testimony was that the petitioner, due to his mental deficiencies, was susceptible to providing a false confession and that the police had unintentionally contaminated the petitioner by revealing all of the key facts included in his confession, the court reasonably found that this theoretical view of the interview was thoroughly contradicted by the credible testimony of the police. Leo acknowledged that he was not sure of what actually transpired during the interview process. He testified that unintentional contamination is not something that occurs in an unspoken fashion, but that it occurs when the police, by actually referring to facts during their interrogation process, provide information about a crime to a suspect. Holt and Lupinacci testified that, apart from referring to a stabbing in the south end of Stamford, they were

---

[10] Also, we observe that there was evidence that the results of additional psychological testing likely would have been unfavorable to the petitioner at trial. At trial, Moniz presented evidence that the petitioner had an overall I.Q. of fifty-nine, placing him in the "[e]ducationally [m]entally [r]etarded range." Testing done by Kapoor reflected that the petitioner's overall I.Q. was eighty-nine, placing him in the low average range, with higher verbal skills, in the average range.

very much mindful of the risks of unintentional contamination and, consistent with their training, did not provide the petitioner with the specific information about the crime that he provided to them. There was no evidence from any witness that the police conveyed anything more than the fact that they were investigating a stabbing in the south end of Stamford and, later, that the victim of the stabbing had died. There was evidence that Holt, the officer primarily involved in the petitioner's interrogation, was unaware of many of the key facts related to the crime.

As the court reasonably found, Moniz addressed the issue of contamination at trial.[11] In his closing argument, echoing themes of his cross-examination of Holt, he unequivocally raised the claim that the diagrams were those of Holt, not the petitioner. As the prosecutor observed, such an argument was strongly discounted by the fact that the diagrams were not complete representations of the immediate area in which the stabbing occurred. The habeas court, in its thorough evaluation of the evidence, reasonably found that the several ways in which the petitioner's statement contradicted the evidence supported a finding that the statement was not the result of police contamination. Our review of the issues raised in connection with this claim leads us to conclude that the court did not abuse its discretion in denying the petition for certification to appeal with regard to this claim.

II

Next, relying on *State* v. *Hafford*, 252 Conn. 274, 316, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000), the petitioner claims that the

[11] As the court found, there was no evidence that the police intentionally contaminated the petitioner. Likewise, there was no evidence that Leo counseled Moniz to rely at trial on a theory of unintentional contamination.

state based its case on his confession, which was uncorroborated, and, thus, was untrustworthy. He argues that the court improperly concluded that the confession was corroborated by substantial independent evidence of criminal activity and, thus, was properly admitted into evidence at trial.

"It is a well-settled general rule that a *naked* extrajudicial confession of guilt by one accused of crime is not sufficient to sustain a conviction when unsupported by *any* corroborative evidence. . . . Properly, the corroborative evidence of the corpus delicti should be presented, and the court satisfied of its material character and adequacy to render any inculpatory statements admissible before they are allowed into evidence." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Harris*, 215 Conn. 189, 192–93, 575 A.2d 223 (1990). In *State* v. *Hafford*, supra, 252 Conn. 316, our Supreme Court adopted the corpus delicti approach set forth by the United States Supreme Court in *Opper* v. *United States*, 348 U.S. 84, 93, 75 S. Ct. 158, 99 L. Ed. 101 (1954). In so doing, it eschewed a requirement that the state need corroborate an inculpatory statement by establishing the crime charged independent of that statement. *State* v. *Hafford*, supra, 317. The court held that, for all types of crimes, "the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. It is [only] necessary . . . to require the Government to introduce substantial independent evidence which would tend to establish *the trustworthiness of the [defendant's] statement.*" (Emphasis in original; internal quotation marks omitted.) Id., 316. As the court went on to explain, "the corroborating facts may be of *any sort whatever,* provided only that they tend to produce a confidence in the truth of the confession." (Emphasis in original; internal quotation marks omitted.) Id., 317.

In rejecting the petitioner's claim, the court in the present case stated in relevant part: "Here, the discovery of the body in the general area that the petitioner described and the medical report showing wounds exactly in the area stated by the petitioner in his confession established sufficient trustworthiness to admit the confession. So, although no new evidence was found after the confession . . . this is not a case of an uncorroborated confession. The confession was corroborated."

We agree with the court that there was ample evidence to corroborate the confession. This is not a case in which an accused's confession was the only evidence of criminal activity. As the court observed, the police found the victim's body in "the general area that the petitioner described" in the south end of Stamford. Apart from the discovery of the victim, the petitioner's statement was corroborated by the fact that the victim died from stab wounds that were consistent with the manner of death described in the statement.

The petitioner argues that his statement was not corroborated by evidence of criminal activity because the state did not have sufficient evidence to convict him apart from the confession, the state did not present physical evidence to link him to the crime, the state did not have eyewitness testimony to link him to the crime, the confession contained several inconsistencies, the interrogation did not yield information not previously known to the police, the petitioner was unable to identify street names relevant to the crime scene, portions of the confession either were contradicted or were rendered highly unlikely by other uncontroverted evidence and the police contaminated him by revealing known facts during the interview process. In terms of his *Hafford* claim, the petitioner's arguments miss the mark. The purpose of the corpus delicti rule is not to erase any doubt as to the accuracy of an

accused's inculpatory statement, but to assure that such a statement is trustworthy because of evidence that the criminal activity described therein actually has occurred. See *State* v. *Hafford,* supra, 252 Conn. 316 (noting that corpus delicti rule meant to "protect accused persons against conviction of *offenses that have not in fact occurred* . . . and prevent errors in convictions based upon *untrue confessions alone*" [emphasis added; internal quotation marks omitted]). As our Supreme Court has observed, "it is sufficient if the corroboration merely fortifies the truth of the confession without independently establishing the crime charged . . . ." (Citations omitted; internal quotation marks omitted.) Id., 317.

Here, the court properly concluded that the petitioner's inculpatory statement was strongly supported by evidence, apart from the statement, that the criminal activity described therein actually occurred. Our review of the issues raised in connection with this claim leads us to conclude that the court did not abuse its discretion in denying the petition for certification to appeal with regard to this claim.

### III

Next, the petitioner claims that Moniz, representing him in his direct appeal, failed to provide him with effective assistance insofar as he did not raise a claim that his confession was uncorroborated and, thus, should have been excluded from the evidence. He argues that the court improperly rejected this claim because ample evidence demonstrated that his confession was not sufficiently corroborated.

"Our Supreme Court has distinguished the standards of review for claims of ineffective assistance of trial counsel and of appellate counsel. . . . For claims of ineffective assistance of appellate counsel, we must assess whether there is a reasonable probability that,

but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed [on] appeal, i.e., [obtaining] reversal of his conviction or granting of a new trial. . . .

"Our Supreme Court has adopted [the] two part analysis [set forth in *Strickland* v. *Washington,* supra, 466 U.S. 687] in reviewing claims of ineffective assistance of appellate counsel. . . . The first part of the *Strickland* analysis requires the petitioner to establish that appellate counsel's representation fell below an objective standard of reasonableness considering all of the circumstances. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . The right to counsel is not the right to perfect representation. . . . [Although] an appellate advocate must provide effective assistance, he is not under an obligation to raise every conceivable issue. A brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions. . . . Indeed, [e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. . . . Most cases present only one, two, or three significant questions. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones. . . . Finally, [i]f the issues not raised by his appellate counsel lack merit, [the petitioner] cannot sustain even the first part of this dual burden since the failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation." (Citations omitted;

internal quotation marks omitted.) *Johnson v. Commissioner of Correction*, 131 Conn. App. 805, 808–809, 29 A.3d 166 (2011).

The court rejected that portion of the petition related to Moniz' failure to advance a corroboration claim in the petitioner's direct appeal. The court, having concluded that the petitioner failed to demonstrate that his confession was not sufficiently corroborated, rejected the claim on the ground that it was without merit.

As the habeas court observed, the petitioner's claim is wholly dependent on his claim that his confession was not sufficiently corroborated. Because we rejected that claim in part II of this opinion, we conclude that the petitioner is unable to demonstrate that he was in any way prejudiced by Moniz' failure to raise that claim on appeal. Accordingly, we conclude that the court did not abuse its discretion in denying the petition for certification to appeal with regard to this claim.

IV

Finally, the petitioner claims that the court improperly rejected his claim of actual innocence. The petitioner argues that he presented "newly discovered evidence" in support of this claim, specifically, "[the] previously unavailable testimony of Dr. Kapoor indicating that [he] had spatial and perceptual deficits which greatly supported his claim of innocence."

"In *Miller v. Commissioner of Correction*, 242 Conn. 745, 747, 700 A.2d 1108 (1997), our Supreme Court held that the proper standard for evaluating a freestanding claim of actual innocence . . . is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence— both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial— he is actually innocent of the crime of which he stands

convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom . . . no reasonable fact finder would find the petitioner guilty of the crime. . . .

"[O]ur Supreme Court has deemed the issue of whether a habeas petitioner must support his claim of actual innocence with newly discovered evidence an open question in our habeas jurisprudence. . . . This court, nevertheless, has held that a claim of actual innocence must be based on newly discovered evidence. . . . [This court has] stated: [A] writ of habeas corpus cannot issue unless the petitioner first demonstrates that the evidence put forth in support of his claim of actual innocence is newly discovered. . . . This evidentiary burden is satisfied if a petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Citations omitted; internal quotation marks omitted.) *Gaston* v. *Commissioner of Correction*, 125 Conn. App. 553, 558–59, 9 A.3d 397 (2010), cert. denied, 300 Conn. 908, 12 A.3d 1003 (2011). "Actual innocence, also referred to as factual innocence . . . is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime." (Citations omitted; internal quotation marks omitted.) *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 560–61, 22 A.3d 1196 (2011).

With regard to the actual innocence claim, the court stated: "I deny the claim on the ground that the petitioner has presented no newly discovered evidence and under the case law by which I am bound, newly discovered evidence is a requirement of an actual innocence claim."

In the habeas court, the petitioner's attorney argued primarily that the evidence from Kapoor, related to spatial and perceptual deficits, was reasonably discoverable at the time of the underlying trial and that Moniz could have and should have presented such evidence at that time. In attempting to demonstrate Moniz' ineffectiveness, the petitioner presented evidence that at the time of trial Moniz knew or should have known that he had spatial and perceptual deficits. The petitioner's attorney argued, however, that it was possible that the court could find that such evidence was not reasonably discoverable at the time of trial. In that circumstance, the petitioner argued, the court should consider it as newly discovered evidence in considering his actual innocence claim. The petitioner's attorney acknowledged that, although he disagreed with such precedent, the habeas court was bound by precedent from this court requiring that actual innocence claims be proven by newly discovered evidence. On appeal, however, the petitioner describes this evidence as being newly discovered, "not previously available to trial and appellate counsel." The petitioner asserts that the evidence at issue demonstrated that his confession was unreliable and that he was unable meaningfully to use the diagrams drawn by Holt. He argues that it demonstrates that he did not commit the crime.[12]

The record supports the court's finding that evidence related to the petitioner's spatial and perceptual deficit was readily discoverable at the time of trial and, thus, was not newly discovered. In any event, the petitioner's claim suffers from a fatal flaw that is not addressed in the habeas court's ruling. Viewed in the light most favorable to the petitioner, the evidence at issue merely

---

[12] In his brief, the respondent argued that the petitioner waived his right to appellate review of this claim by virtue of the representations of the petitioner's attorney before the habeas court. At oral argument before this court, however, the respondent abandoned that argument.

casts doubt on his confession and whether the state satisfied its burden of proof beyond a reasonable doubt at trial. The habeas court did not deem the evidence at issue to have cast any doubt on the petitioner's confession. Even if this evidence was highly persuasive, it did not affirmatively prove that the petitioner did not commit the crime. Thus, even were we to agree with the petitioner that the evidence was newly discovered, the evidence as a matter of law does not support a claim of actual innocence. Our review of the issues raised in connection with this claim leads us to conclude that the court did not abuse its discretion in denying the petition for certification to appeal with regard to this claim.

After a careful review of all of the claims raised on appeal, we conclude that the habeas court's resolution of the issues is not debatable among jurists of reason, that a court could not resolve the issues in a different manner or that the questions raised deserve encouragement to proceed further. Accordingly, we conclude that the court's denial of the petition for certification to appeal did not constitute an abuse of discretion and that this appeal should be dismissed.

The appeal is dismissed.

In this opinion the other judges concurred.